UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JEANETTE C. RENSTROM, | Case No. 09-CV-1823 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| NASH FINCH COMPANY, | |
| Defendant. | |

LeAnne D. Miller, Eric S. Oelrich, RAJKOWSKI HANSMEIER LTD., for plaintiff.

David M. Wilk, LARSON KING, LLP, for defendant.

Plaintiff Jeanette Renstrom, a former employee of defendant Nash Finch Company ("Nash Finch"), brings this action under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01 et seq.  Renstrom alleges that Nash Finch paid her less than two male employees who performed equal work.

This matter is before the Court on Nash Finch's motion for summary judgment.  For the reasons stated below, Nash Finch's motion is granted.

I.  BACKGROUND

Nash Finch is a wholesale food distributor headquartered in Minnesota.  The company is divided into regions, and each region contains multiple distribution centers.  Nash Finch's Midwest region contains at least six distribution centers:  St. Cloud, Minnesota; Cedar Rapids,

Iowa; Omaha, Nebraska; Fargo, North Dakota; Minot, North Dakota; and Rapid City, South Dakota. Renstrom Aff. ¶ 2.[1]

Renstrom first starting working for Nash Finch in 1970. Wilk Aff. Ex. 2. Renstrom left Nash Finch in 1979 and, after a four-year stint running her own business, returned to Nash Finch in 1983. Renstrom Dep. 11; Wilk Aff. Exs. 2, 3. Renstrom worked in various capacities at Nash Finch until 1997, when she became the head grocery buyer at the St. Cloud distribution center. Renstrom Aff. ¶ 2. Renstrom remained the head grocery buyer at the St. Cloud distribution center until her retirement in February 2009. Wilk Aff. Ex. 5.

Typically, each distribution center is run by a division manager, and that division manager supervises the head grocery buyer (and others). *See* Jaeger Dep. 12, 14; Stinebaugh Aff. ¶¶ 1-2; Zahrt Aff. ¶¶ 1-2; Lane Aff. ¶ 3. The division manager reviews the head grocery buyer's job performance, and, based on those reviews, decides whether and to what extent the head grocery buyer should receive pay raises. Stinebaugh Aff. ¶ 3; Alexander Dep. 72; Jaeger Dep. 22, 48-49. The division managers report to the vice president for food distribution for the Midwest region. The vice president has the authority to approve or disapprove the compensation decisions made by the division managers, including decisions about the pay of the head grocery buyers. *See* Jaeger Dep. 14; Stinebaugh Aff. ¶¶ 1, 3; Zahrt Aff. ¶¶ 1, 8; Lane Aff. ¶ 3; Alexander Dep. 75.

Renstrom alleges that she was paid less than two other head grocery buyers who performed equal work: Bill Crosier, who was the head grocery buyer for the Omaha distribution

---

[1]Other evidence in the record indicates that there is a seventh Midwest distribution center in Sioux Falls, South Dakota. Jaeger Dep. 14.

center, and Dale Ebensteiner, who was the head grocery buyer for both the Fargo and Minot distribution centers.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.

### B.  EPA Claim

The EPA provides, in relevant part, as follows:

> No employer . . . shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1).  To make out a prima facie case under the EPA, the plaintiff must show that her employer paid her less than a male employee for equal work in jobs that required equal skill, effort, and responsibility and that were performed under similar working conditions.

*Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003). If the plaintiff makes out a prima facie case, the employer must show that the pay differential was based on a factor other than sex (or on one of the other affirmative defenses enumerated in § 206(d)(1)). *Id.* at 716.

As noted, Renstrom alleges that Crosier (the head grocery buyer for the Omaha distribution center) and Ebensteiner (the head grocery buyer for both the Fargo and Minot distribution centers) performed equal work for higher pay. There is no dispute that Crosier and Ebensteiner were paid more than Renstrom. But the Court agrees with Nash Finch that Crosier and Ebensteiner are not proper comparators for two reasons: First, Crosier and Ebensteiner did not work at the same "establishment" as Renstrom. Second, Renstrom did not perform work equal to that of Crosier and Ebensteiner.

1. "Establishment"

The EPA was enacted in 1963 as an amendment to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq. *See* Equal Pay Act, Pub. L. 88-38, 77 Stat. 56 (1963). The term "establishment" appears throughout the FLSA — and, long before the EPA amended the FLSA, the term "establishment" had repeatedly been held to refer to "a distinct physical place of business" and not to an entire business or enterprise. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945); *see also Mitchell v. Bekins Van & Storage Co.*, 352 U.S. 1027 (1957) (per curiam) (holding that five physically separate warehouses located in the same city were separate establishments); *Mitchell v. Birkett*, 286 F.2d 474, 478 (8th Cir. 1961) ("Common ownership and close functional and economic relationship between physically separated units of a business are not sufficient to make such combined units a single establishment, particularly where, as here, the geographical separation is substantial.").

Thus, when Congress enacted the EPA — and expressly limited application of the EPA to employees working at the same "establishment" — Congress was not writing on a blank slate. *See* 29 U.S.C. § 206(d)(1). Instead, Congress was borrowing a term from elsewhere in the FLSA — a term that had acquired a well-settled meaning. There is absolutely no evidence that, in using the term "establishment," Congress intended the term to have a broader meaning in the EPA than it had in the rest of the FLSA. Reflecting this fact, the Equal Employment Opportunity Commission ("EEOC") adopted the geographical meaning of the term "establishment" for purposes of the EPA:

> Although not expressly defined in the FLSA, the term "establishment" had acquired a well settled meaning by the time of enactment of the Equal Pay Act. It refers to a distinct physical place of business rather than to an entire business or "enterprise" which may include several separate places of business. Accordingly, each physically separate place of business is ordinarily considered a separate establishment.

29 C.F.R. § 1620.9(a); *see also Krenik v. County of Le Sueur*, 47 F.3d 953, 961 (8th Cir. 1995) (when analyzing an EPA claim, courts must give weight to and be guided by the EEOC's interpretive regulations).

Although neither § 1620.9(a) nor the Supreme Court's decisions in *A.H. Phillips* and *Bekins Van & Storage* seem to admit of any exceptions to the strictly geographical interpretation of "establishment," a number of courts have held that, notwithstanding this general rule, there are circumstances under which separate physical locations may be treated as one "establishment" for purposes of the EPA. The leading case for this proposition is *Brennan v. Goose Creek Consolidated Independent School District*, 519 F.2d 53 (5th Cir. 1975). In *Goose Creek*, the Department of Labor brought EPA claims against a school district on behalf of a group of female

janitors. *Id.* at 54. The Fifth Circuit held that the school district should be treated as a single "establishment" under the EPA because "the central administration of the school district (not the principals of the schools) hired the janitors, determined their wages, assigned them to the school building in which they were to work, and sometimes switched their assignments from one building to another." *Id.* at 56.

Consistent with *Goose Creek*, the EEOC recognizes that, in "unusual circumstances," the geographical rule may give way and two distinct places of business may be treated as a single establishment. Specifically, the EEOC has said that, although "each physically separate place of business is ordinarily considered a separate establishment," 29 C.F.R. § 1620.9(a),

> unusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions. Barring unusual circumstances, however, the term "establishment" will be [construed to mean a physically separate place of business].

29 C.F.R. § 1620.9(b).

Renstrom argues that this is a case in which "unusual circumstances" warrant treating separate geographical locations — specifically, the Nash Finch distribution centers — as a single establishment. She points to evidence showing that the vice president for food distribution for the Midwest region had the ultimate authority to approve performance reviews, determine compensation levels, and make personnel decisions regarding head grocery buyers and other employees at the distribution centers; that the vice president actually exercised his authority on occasion and overrode the compensation decisions of division managers; and that Nash Finch's

corporate office created a single job description and a single salary range that applied to all head grocery buyers (at least in the Midwest region).  All of this, argues Renstrom, is the kind of "unusual" centralized control that warrants treating every distribution center in the Midwest as a single "establishment" for purposes of the EPA.

The Court disagrees.  Far from being "unusual," the features to which Renstrom points — a corporation's ultimate oversight over compensation and personnel decisions — are commonplace.  If such facts were sufficient to overcome the "ordinar[y]" and "well settled" rule that physically distinct locations are different "establishments" for purposes of the EPA, then just about any corporation with a hierarchical management structure and a functioning human-resources department would find itself defined as a single "establishment."

Neither *Goose Creek* nor § 1620.9(b) calls for such a sweeping exception to the geographical rule — an exception that would largely swallow the rule.  In *Goose Creek*, the school district did not just set wages and job classifications; it also conducted all of the hiring, assigned the janitors to various locations, and then transferred janitors from one location to another as necessary.  *Goose Creek*, 519 F.2d at 58.  In other words, the school district itself treated the schools as a single "establishment" and treated the janitors as fungible workers whose assigned location within that establishment could be changed as necessary.  Likewise, § 1620.9(b) essentially tracks the factors identified in *Goose Creek* and expressly states that the exception should be reserved for "unusual circumstances."  *See also Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1464 (9th Cir. 1985) ("When considering the single establishment issue, federal courts have consistently rejected the extension of the statutory establishment requirement

to separate offices of an employer that are geographically and operationally distinct."), *overruled on other grounds by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991).

The evidence in this case does not show that Nash Finch exercised the degree of centralized control that the school district exercised in *Goose Creek*. There is no evidence that Nash Finch hired employees through a central office and then assigned them to work at various locations based on Nash Finch's shifting personnel needs. Instead, the evidence demonstrates that, at most, Nash Finch's corporate office had ultimate authority over the compensation of all Nash Finch employees. In the Court's view, this does not set Nash Finch apart from most corporations and thus does not establish the "unusual circumstances" necessary to justify treating all of Nash Finch's distribution centers as a single "establishment" for purposes of the EPA.

The Court acknowledges that some courts have strayed from the traditional geographical rule and construed "establishment" broadly for purposes of the EPA. *See Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591-92 (11th Cir. 1994) (holding that the plaintiff should be compared with project managers at separate physical locations because the project managers did the same kind of work, the project managers all reported to the plaintiff, and the company made centralized compensation decisions); *Brownlee v. Gay & Taylor, Inc.*, 642 F. Supp. 347, 352 (D. Kan. 1985) ("where central supervision exists and where pay standards apply for an entire business entity regardless of where the employee is located, individuals should be compared on the basis of their employment function and not geographic location"), *aff'd*, 861 F.2d 1222 (10th Cir. 1988); *Grumbine v. United States*, 586 F. Supp. 1144, 1148 (D.D.C. 1984) (declining to give "establishment" a geographic meaning because "this reasoning has little relevance to the Equal

Pay Act" and should not apply "where typically central supervision exists and pay standards apply for an entire system irrespective of where the employee happens to be located").

These courts reason that, when the Supreme Court originally construed the term "enterprise" in the FLSA, that term was being used in an *exemption* from the FLSA, and thus the term was construed narrowly. *See A.H. Phillips, Inc.*, 324 U.S. at 493. According to these courts, such a narrow interpretation of "enterprise" should not carry over to the term's use in the EPA. *See, e.g., Grumbine*, 586 F. Supp. at 1147-48. But these courts focus on only part of the reason for the Supreme Court's interpretation of "enterprise." In formulating the geographical rule, the Supreme Court also noted that such an interpretation reflected the term's common usage in business and government. *Id.* More importantly, when Congress enacted the EPA nearly twenty years *after* the Supreme Court first construed "establishment," Congress was surely aware of the "well settled" meaning of the term. *See* 29 C.F.R. § 1620.9(a). And with that awareness, Congress adopted statutory language that clearly and emphatically applies only to workers at a single establishment. Indeed, Congress used the term "establishment" three times in the key sentence of the EPA: "No employer . . . shall discriminate, *within any establishment* in which such employees are employed, between employees on the basis of sex by paying wages to employees *in such establishment* at a rate less than the rate at which he pays wages to employees of the opposite sex *in such establishment* . . . ." 29 U.S.C. § 206(d)(1) (emphasis added).

It is a well-established canon of statutory construction that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007). Given that "establishment" had a well-defined meaning at the time that Congress enacted the EPA, it is very difficult to believe that Congress

intended the term to have one meaning in the EPA and an entirely different meaning in the rest of the FLSA. Surely, if Congress intended such an unusual result, it would have communicated its intention in some way. Indeed, if Congress wanted the EPA to escape the geographical rule, it easily could have omitted the term "establishment" from the EPA. Instead, Congress chose to use the term three times.

Moreover, as discussed above, the EEOC has fully embraced the geographical interpretation of "establishment" for purposes of the EPA and recognized only a narrow exception that applies only in "unusual circumstances." Giving weight to this interpretive regulation (as the Court must do, *see Krenik*, 47 F.3d at 961), the Court declines to follow judicial decisions that would ignore the EEOC's view and expand the exception to the point where it swallows the general rule. Those judicial decisions may reflect sound public policy, especially given the radical changes in the American workplace since the EPA was enacted in 1963. But it is the responsibility of Congress, not this Court, to decide whether, when, and how to revise the EPA to reflect changes in society.

The Court therefore holds that, for purposes of the EPA, each of Nash Finch's distribution centers is a separate "establishment." Because Renstrom did not work at the same establishment as the two comparators that she has identified (Crosier and Ebensteiner), her claim under the EPA must be dismissed.

2. Prima Facie Case

Renstrom's EPA claim must be dismissed for the additional reason that she has not demonstrated that she performed work equal to that of Crosier and Ebensteiner. As explained above, to establish a prima facie case, Renstrom must identify male employees who were paid more for equal work in jobs that required equal skill, effort, and responsibility and that were performed under similar working conditions. *Taylor v. White*, 321 F.3d 710, 715 (8th Cir. 2003). Jobs do not have to be identical to be considered "equal" under the EPA. *Krenik v. County of Le Sueur*, 47 F.3d 953, 961 (8th Cir. 1995). At the same time, job titles and classifications are not dispositive; it is the actual requirements of the jobs that control. *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003). "Whether two jobs are substantially equal requires a practical judgment on the basis of all the facts and circumstances of a particular case, including factors such as level of experience, training, education, ability, effort, and responsibility." *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 492 (8th Cir. 2003) (citations and quotations omitted). "Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." 29 C.F.R. § 1620.14(a).

The parties have submitted Nash Finch's job description for head grocery buyer. *See* Oelrich Aff. Ex. B. According to the job description, a head grocery buyer's duties include coordinating grocery merchandising, sales promotion, and the distribution of grocery products; overseeing the use of grocery-merchandising, procurement, and advertising plans; supervising inventory turnover; evaluating customer-requested grocery items; keeping abreast of market trends; and regularly communicating with retail customers and vendors. *Id.*

There is no dispute that this job description is an accurate account of a head grocery buyer's general duties; both Crosier and Ebensteiner testified that the job description is essentially correct. *See* Crosier Dep. 59-60; Ebensteiner Dep. 39. Thus, because Crosier, Ebensteiner, and Renstrom all performed these same functions, there can be little question that their jobs all involved equal skill and responsibility. *See Krenik*, 47 F.3d at 960 (noting that "[s]kill includes such considerations as experience, training, education, and ability" and "[r]esponsibility concerns the degree of accountability required in performing a job" (citation and quotations omitted)). The only real dispute, then, is whether the jobs involved equal effort.

Both Crosier and Ebensteiner testified that they have greater workloads than typical head grocery buyers. As noted earlier, Ebensteiner is the head grocery buyer for two distribution centers that are approximately 300 miles apart: Fargo and Minot. Because of this, Ebensteiner testified, he has "double the responsibility":

> . . . I have two different distinct [distribution centers]. When you're looking at [distribution centers], you look at the number of SKUs that we each have. And currently in the Fargo-Minot Distribution Center, we have over 25,000 different SKUs, and each one of those is unique to the separate facility. There are two separate databases so consequently when anything is done, if it's an ad, if it's a promotion, if it's new items, everything is double that I would have to do when we're putting in these kind of events.

Ebensteiner Dep. 39-40; *see also* Zahrt Aff. ¶ 6 (work relating to advertisements, promotions, new items, inventory, and buying had to be performed twice by Ebensteiner).[2] Consistent with

---

[2]Renstrom contends that Curtis Zahrt, who was the division manager for the Fargo and Minot distribution centers and Ebensteiner's direct supervisor, lacks personal knowledge of the work done by head grocery buyers at other distribution centers and that therefore Zahrt's assessment of Ebensteiner's relative workload is invalid. The Court disagrees. As Ebensteiner's supervisor, Zahrt was certainly in a position to observe that Ebensteiner had to perform many of

(continued...)

this testimony, Ebensteiner had double (or nearly double) the number of direct reports as Renstrom. While Renstrom had six employees report directly to her, Ebensteiner had 10 to 12. *See* Zahrt Aff. ¶ 3 (Ebensteiner had between 10 and 12 direct reports during the period 2006 through February 2009); Renstrom Dep. 104 (Renstrom had six direct reports).

Similarly, Crosier testified that he has a greater workload than a typical head grocery buyer because, in addition to working at the largest distribution center in the Midwest region — Omaha is nearly twice as large as St. Cloud, Stinebaugh Aff. ¶ 4 — Crosier served 18 military facilities:

> I have to duplicate for the military, so it's like double work. . . .
>
> I have to stay in constant communication with the military department in terms of handling dated product. It's handled differently than in civilian. In terms of aged inventory, it's handled differently than civilian. In terms of dated product pulled, it's handled differently than civilian. In terms of any excess in and out inventory, suspended inventory, pending discontinued inventory has to be handled differently than civilian. You have to go through a lot of steps, a lot of e-mails, a lot of conversations, back and forth negotiations to get anything done . . . .
>
> . . . In general it's the same functions, but to perform those functions it's totally different for military than it is for civilian.

Crosier Dep. 16, 67-69; *see also* Jaeger Dep. 28-29 ("with the military base, you may have the same item; but it has to be in a separate slot, so you have to control two inventories of like

---

[2](...continued)
the same tasks twice.

products"); Stinebaugh Aff. ¶ 5 ("Crosier is responsible for two separate inventories, including the financial reporting and financial management of both inventories").[3]

Renstrom argues that these differences are insubstantial. As to Ebensteiner, she argues that the St. Cloud distribution center is larger in terms of sales, profitability, and number of customers than the Fargo and Minot distribution centers combined. Renstrom Aff. ¶ 3. But that does not rebut the evidence that, because Ebensteiner was the head grocery buyer for two distribution centers, he had to perform many tasks twice, while Renstrom had to perform those same tasks only once. Nor does it rebut the evidence that Ebensteiner had almost twice as many direct reports as Renstrom.

Renstrom also argues that she, too, had duties beyond those of a typical head grocery buyer. Unlike most head grocery buyers, Renstrom argues, she was responsible for supervising the head produce buyer and the head meat buyer at the St. Cloud distribution center.[4] Renstrom says that she devoted two extra hours per day to meeting these added responsibilities. Renstrom

---

[3]Renstrom contends that Crosier testified that he does not personally do the extra work entailed by the military accounts. This contention is based on a misreading of Crosier's testimony. Crosier clearly testified that he had a greater workload as a result of his military accounts, and he also clearly testified that he personally handled the extra work. *See* Crosier Dep. 70 ("Q. Now, when you're talking about these numerous e-mails and phone calls and the accounting, is that something that you're personally doing or is this something that you're delegating to subordinates? A. No, I'm personally doing it.").

[4]Renstrom testified that both Crosier and Ebensteiner told her that they did not supervise the produce or meat buyers. Renstrom Dep. 47. It is not clear whether this is true. But both Crosier's and Ebensteiner's statements are "statement[s] by [a] party's . . . servant concerning a matter within the scope of . . . employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D); *see DCS Sanitation Mgmt., Inc. v. Occupational Safety & Health Review Comm'n*, 82 F.3d 812, 815 (8th Cir. 1996) (holding that OSHA's interviews with employees concerning workplace accident were admissible under Rule 801(d)(2)(D)). Thus, the statements are not hearsay, and the Court will treat them as true.

Aff. ¶ 6. There does not, however, seem to be evidence in the record of the total number of hours that Renstrom worked per week. In particular, there is no evidence that, as a result of her added responsibilities, she routinely worked more than 40 hours per week.[5] By contrast, Ebensteiner testified that he worked an average of 50 hours per week, Ebensteiner Dep. 42-43, and Crosier testified that he worked an average of 60 or more hours per week, Crosier Dep. 15-16.

Without evidence of Renstrom's typical work schedule, it is not possible to compare the burden imposed on Renstrom by her additional duties with the burdens imposed on Crosier and Ebensteiner by their additional duties. In light of the undisputed evidence that both Crosier and Ebensteiner had essentially "double work" — Crosier because he handled military installations, and Ebensteiner because he handled two distribution centers — Renstrom cannot meet her burden to show that the jobs required equal effort. See 29 C.F.R. § 1620.14(a) ("The terms [equal skill, equal effort, and equal responsibility] constitute separate tests, each of which must be met in order for the equal pay standard to apply."). The Court therefore grants defendants' motion for summary judgment on Renstrom's EPA claim.

---

[5] The record contains printouts of computerized payroll records for a number of employees. All of those records list a total number of hours for each year for each employee (including regular, vacation, holiday, and personal leave). See Glasheen Aff. Exs. A-G. These records appear to reflect nothing more than a system for tracking vacation and other types of leave; for most years, the totals add up to 2,080 hours for every employee (which is exactly 40 hours per week for 52 weeks). There is no dispute that Renstrom, Crosier, and Ebensteiner were all salaried employees, and there is no evidence that any of them punched a clock or that Nash Finch otherwise tracked the *actual* number of hours they worked. Moreover, both Crosier and Ebensteiner testified (without contradiction) that they worked more than 40 hours per week. For these reasons, the Court finds that these printouts do not create a genuine issue of fact concerning the number of hours actually worked by Crosier, Ebensteiner, and Renstrom.

*C. Title VII and MHRA Claims*

The Eighth Circuit has long held that "[w]here a claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of Title VII." *McKee v. Bi-State Dev. Agency*, 801 F.2d 1014, 1019 (8th Cir. 1986); *see also Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1072 (8th Cir. 2009) ("Since Drum's allegations relate solely to unequal pay for equal work, her Title VII claim is governed by the standards of the Equal Pay Act (EPA), 29 U.S.C. § 206(d)."); *Orahood v. Bd. of Trustees of Univ. of Ark.*, 645 F.2d 651, 654 n.3 (8th Cir. 1981) ("Under a pure claim of unequal pay for equal work, the standards of the Equal Pay Act apply whether the suit alleges a violation of that Act or Title VII.").[6] Likewise, Minnesota courts follow EPA standards in determining whether a plaintiff has made out a prima facie case of unequal pay for equal work under the MHRA. *See Danz v. Jones*, 263 N.W.2d 395, 398-400 (Minn. 1978) (applying standards developed under Title VII and the EPA to an MHRA case alleging unequal pay). Because Renstrom has failed to meet her prima facie burden under the EPA, her Title VII and MHRA claims must also be dismissed.

---

[6] A plaintiff may pursue a Title VII disparate-treatment claim even when she cannot make out a prima facie case of unequal pay for equal work. *See Washington Cnty. v. Gunther*, 452 U.S. 161, 181 (1981) (holding that plaintiffs could proceed with a disparate-treatment claim under Title VII even though they could not establish a prima facie case of unequal pay for equal work under the EPA); *Orahood*, 645 F.2d at 654 n.3 ("Where the claim is one involving inadequate compensation, but a comparison with equal work is not possible, Title VII may still provide relief."). Here, however, Renstrom is not pursuing a traditional disparate-treatment claim under Title VII or the MHRA. To the contrary, Renstrom testified that the pay disparity was *not* due to her sex: "Q. And when you make less than men, is it because of your sex? A. No." Renstrom Dep. 30.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [Docket No. 42] is GRANTED.

2. Plaintiff's complaint [Docket No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: April 18, 2011　　　　　　　　　　　s/Patrick J. Schiltz
　　　　　　　　　　　　　　　　　　　　　　Patrick J. Schiltz
　　　　　　　　　　　　　　　　　　　　　　United States District Judge